**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| DANIEL M. FORT, | ) | Civil Action No.:   2:23−cv−03931-BHH-MGB |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| vs. | ) | **Violation of the ADEA;** |
| | ) | **Violation of the FMLA;** |
| HUDSON CHARLESTON ACQUISITION | ) | **Violation of the ADA/ADAAA** |
| II, LLC dba HUDSON NISSAN | ) | |
| OF CHARLESTON, | ) | |
| | ) | |
| Defendant. | ) | **JURY TRIAL DEMANDED** |
| _____ | ) | |

The plaintiff, complaining of the acts of the defendant, alleges as follows:

1.      That the plaintiff is a citizen and resident of the County of Charleston, State of South Carolina.

2.      That, upon information and belief, the defendant Hudson Charleston Acquisition, II, LLC dba Hudson Nissan of Charleston ("defendant") is a South Carolina limited liability corporation doing business and maintaining offices and agents in the County of Charleston, State of South Carolina.  Moreover, upon information and belief, the partners of the LLC reside in the County of Charleston, State of South Carolina.

3.      That this court has federal question jurisdiction of the above-styled action pursuant to 29 U.S.C. § 623, et seq. (the Age Discrimination in Employment Act or "ADEA"); 29 U.S.C. §§ 2601-2654, (the Family Medical Leave Act or "FMLA"); 42 U.S.C. § 12101, et seq. (the Americans with Disabilities Act or "ADA" and its 2008 Amendments "ADAAA", collectively referred to as the "ADA/ADAAA"); 42 U.S.C. § 12203 (the retaliation provision of the ADA/ADAAA); and 28 U.S.C. § 1331.

1

4.    That venue for all causes of action stated herein lies in the District of South Carolina, Charleston Division, as defendant does business here, its partners reside here, plaintiff resides here, and a substantial portion of the facts giving rise to plaintiff's claims occurred here.

## CONDITIONS PRECEDENT

5.    That plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of his First Cause of Action for Violation of the ADEA and for his Third and Fourth Causes of Action for Violation of the ADA/ADAAA, all of which are more fully described below.

6.    That at all relevant times as defined by the ADA/ADAAA and the ADEA, defendant employed fifteen (15) or more employees as required by the ADA/ADAAA and twenty (20) or more employees as required by the ADEA.  As such, the defendant is an "employer" as defined by the ADA/ADAAA and the ADEA and is otherwise subject to and covered by both Acts.

7.    That on or about June 15, 2022, and as a result of defendant's discriminatory conduct, all of which is more fully described below, plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging harassment, discrimination, retaliation and constructive discharge based on age and disabilities (all in regard to a demotion and constructive discharge).

8.    That on or about June 13, 2023 plaintiff received a Notice of Right to Sue from the EEOC regarding the Charge of Discrimination described in Paragraph 7 above.

9.    That thereafter, plaintiff timely filed the foregoing action within ninety (90) days of the date on which he received the Notice of Right to Sue described above in Paragraph 8.

2

**FACTUAL ALLEGATIONS**

10.  That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 9 hereinabove as fully as if set forth verbatim.

11.  That plaintiff was born in 1963 and, thus, was over forty (40) years of age (or in his late fifties) during the time of the discrimination alleged herein.  Also sometime in 2019 while plaintiff was employed with defendant, plaintiff was diagnosed with pancreas divisum, a congenital birth defect involving the ducts of (or to) the pancreas.  Most human embryos start life with the pancreas in two (2) parts, each part with its own duct. Later during the development process, these two (2) parts of the pancreas and the two (2) ducts fuse to make one pancreas and one duct.  Fluid and digestive juices (or enzymes) produced by the pancreas flow through this duct.  In pancreas divisum, the two (2) ducts to the pancreas fail to fuse during development, leaving the pancreas with two (2) separate ducts.  In plaintiff's case, of course his ducts did not fuse and he was left with two (2) separate ducts.  In addition, one of plaintiff's two (2) ducts, the main or primary duct (in which the enzymes flow through) never fully formed. When this duct becomes blocked, swelling and tissue damage occur.  The symptoms of the impairment for plaintiff include, but are not limited to: severe and debilitating abdominal pain, nausea and vomiting, significant fatigue, and spikes in blood pressure.  With plaintiff, these symptoms would occur intermittently, about six (6) or so times a year, and each episode or flareup would last three (3) to five (5) days which usually involved plaintiff being hospitalized for several of those days.  Moreover, as a direct result of his impairment, plaintiff developed and suffered from Type II Insulin Dependent Diabetes.  Both impairments are long-term, chronic and permanent.  These impairments significantly limit plaintiff in the major life activities of, among other things, eating, digesting, sleeping, thinking, focusing and working.

12.    That on or about August 12, 2018 plaintiff was hired by defendant as a Service Advisor to work at its car dealership on Savannah Highway in Charleston, South Carolina.

13.    That after only about two (2) months of employment with defendant, defendant promoted plaintiff into the position of Service Manager at the same location where plaintiff was charged with supervising the seven (7) or so Advisors he used to work with and the twelve (12) or so technicians (or mechanics) who worked closely with the Advisors.  He also supervised one (1) Lane Manager, one (1) Warranty Clerk and two (2) Porters.

14.    That also as Service Manager, plaintiff enjoyed full supervisory authority, including the authority to hire, discipline, fire, direct, and manage the employees who reported to him as described above.  The job did not require plaintiff to perform the duties of the positions he supervised, but rather, plaintiff's duties all involved supervisory or other "light-duty" types of tasks.

15.    That the Service Manager position carried a significant amount of prestige with it, and it paid very well, with plaintiff earning approximately $144,000 in gross income a year (or what averaged to be about $12,000 per month), with full benefits. At the same time, plaintiff loved his job at defendant and planned to work there until he retired.

16.    That plaintiff performed the duties of his job at defendant in an above-satisfactory fashion and maintained an excellent employment record there.  To this point, for the past two years prior to his demotion at defendant, plaintiff's team (under plaintiff's guidance) was consistently ranked number one (1) out of approximately nine (9) Nissan dealerships on the east coast and number one (1) or two (2) out of all Hudson dealerships, including Nissan, Chevrolet, Dodge (and others) in terms of the various metrics defendant tracked such as

customer satisfaction, average tickets, and gross profit, among other things.  And, while plaintiff never received a written formal performance evaluation at defendant, he routinely received praise by management for the quality of his work and his work ethic.  Moreover, other than the demotion giving rise to this claim, plaintiff was never disciplined in any shape or form the entire time he worked at defendant even though defendant had and followed a progressive discipline policy.

17.     That in fact, plaintiff's last direct supervisor continued to verbally praise plaintiff's performance literally during the entire period of time that he supervised plaintiff, even telling plaintiff that he planned to promote plaintiff into his own position in the near future, when he got promoted.  This praise and these assurances by plaintiff's direct supervisor continued up until the time of plaintiff's demotion.

18.     That as far as a chain of command, as Service Manager plaintiff reported directly to the Fixed Operations Director ("Director") who at first was Michael Hermelin ("Hermelin").  Thereafter, in or around 2019 Tony Belcastro ("Belcastro') replaced Hermelin and became the new Fixed Operations Manager and plaintiff's new supervisor. Both Hermelin and Belcastro reported to the General Manager, Paul Canovali ("Canovali").

19.     That shortly before Belcastro became plaintiff's direct supervisor defendant hired a young male in his early twenties, Austin Ranly ("Ranly"), as a car washer. Ranly was later promoted to Manager of the car wash, and then promoted once again into a Service Advisor position (the position plaintiff held when he was hired by defendant).

20.     That soon after Belcastro took the Director's job, plaintiff told Belcastro he would be willing to step in and train the young Ranly to become a Lane Manager.  Belcastro approved the request and plaintiff trained Ranly for the Lane Manager job.

21.    That as they continued to work together, Belcastro was not shy about verbally praising plaintiff's job performance, telling plaintiff, among other things, that plaintiff was an outstanding employee and that he was grooming plaintiff to take over his job as Fixed Operations Director and grooming Ranly to take over plaintiff's job and that the above changes were imminent and would take place in the near future.

22.    That, in fact, Belcastro made these types of remarks to plaintiff on many occasions, all in a serious and professional manner, and literally within weeks of plaintiff's demotion. Of course, plaintiff relied on these comments as a credible indication that his performance was strong and that plaintiff would, indeed, be promoted into the Director of Fixed Operations position. This is especially true since defendant did not provide formal, written performance evaluations to plaintiff, so plaintiff's only input regarding his performance was the verbal remarks and the assurances of his supervisor.

23.    That unfortunately, in or around February or March of 2019 (soon after Belcastro became plaintiff's supervisor), plaintiff began to experience severe pain in his stomach, nausea, vomiting, fatigue and spikes in his blood pressure. At the time, plaintiff had not been diagnosed and did not know what was causing these symptoms. When plaintiff went to his doctor for consultation, plaintiff was advised that the issue was in his gallbladder and they recommended that plaintiff's gallbladder be removed. Plaintiff followed his doctor's advice and had surgery to remove his gallbladder, only using several days of medical leave in the process.

24.    That however, when plaintiff returned to work, the pain in his stomach continued and it was just as intense as it had been before his surgery. After visiting other doctors, plaintiff's family physician, Dr. Rachel Zealy, referred plaintiff to Dr. Forrester at MUSC. Dr. Forrester ordered an MRI and after, plaintiff's physician reviewed the results of the

MRI, he diagnosed plaintiff with pancreas divisum, the rare birth defect described above. Also as alleged, and as a direct result of plaintiff's pancreas divisum, plaintiff developed Type II Insulin Dependent Diabetes. Of course, plaintiff immediately advised Belcastro and the rest of upper management about all of his diagnoses, his symptoms and the impact they would have on his work schedule.

25.     That in the meantime, plaintiff continued to work without using much, if any, medical leave, as plaintiff always scheduled his doctor's appointments for times he was off of work. However, in or around the beginning of 2020, plaintiff began to experience flareups from his pancreatic impairment at work where plaintiff would become nauseous, vomit, experience debilitating stomach pain, a lack of energy, and blood pressure spikes, among other symptoms. Though it was hard for the plaintiff to predict when these flareups would occur or how serious they would be, whenever the flareups started, plaintiff always advised management, including his supervisor Belcastro, as soon as he could that he felt ill; that he was beginning to experience the symptoms related to his disabilities; and that he needed to take medical leave. Typically with each flareup, plaintiff would miss about three (3) to five (5) days of work, during which time he would be hospitalized for several of those days.

26.     That in or around March of 2020 defendant furloughed plaintiff and some other employees for about three (3) weeks due to COVID. During this time, Ranly (who was not furloughed) was given the title of Lane Manager and began to perform the duties of that job – a job plaintiff trained Ranly to perform.

27.     That sometime in or around April of 2020 defendant lifted plaintiff's furlough and plaintiff returned to work where all went well for plaintiff for about the next fifteen (15) months. During this time, plaintiff continued to perform his job and he continued to lead his

team in a strong fashion.  At the same time, he continued to have intermittent pancreatic flareups, which caused him to miss work, take medical leave, and to spend time in the hospital.

28.    That on or about Monday, August 9, 2021, plaintiff went to work as usual. However, once there, he began to feel sick (in ways unrelated to his pancreas impairment).  As plaintiff always did on such occasions, he told Belcastro that he did not feel well and that the following day (August 10, 2021) he was going to get a COVID test at Urgent Care.  Belcastro approved plaintiff's request and plaintiff stayed and worked the rest of the day on August 9, 2021.

29.    That the next day, August 10, 2021, plaintiff went to Urgent Care and got a COVID test which came back positive.  Apparently plaintiff had contracted the disease at work.

30.    That as a result of his positive COVID test, plaintiff was taken out of work beginning on or about August 10, 2021. While still out on COVID-related medical leave, plaintiff experienced a very serious pancreatic flareup, one so bad he was taken to the emergency room and hospitalized for four (4) or five (5) days with his blood pressure spiking to 225/115 at one point.  Of course, plaintiff advised his supervisor of all of the above, even though he was already out of work.

31.    That while plaintiff was still out on medical leave (sometime between August 10-August 24, 2021) Belcastro called plaintiff and told plaintiff he was proud of him as, despite all that was going on, plaintiff was performing all the tasks he (Belcastro) was "throwing at him" in exemplary fashion; that plaintiff was doing a great job and exceeding expectations; and that plaintiff would be promoted into the Fixed Operators Director job in the near future. Plaintiff's wife was right beside plaintiff during the call and listened to both sides of the entire conversation, clearly hearing all of her husband's remarks as well as all of Belcastro's remarks.

32.     That on or about August 25, 2021, after about two (2) weeks of medical leave, plaintiff reported back to work as scheduled.  Admittedly, though, plaintiff was not 100% upon his return.  Still, plaintiff battled through his symptoms and was able to continue to work at a level that met defendant's legitimate expectations.

33.     That about a month later, on or about September 24, 2021, at or around 10:00 to 10:30 a.m., plaintiff began to feel extremely sick at work and he could tell he was having another pancreatic flareup.  Specifically, plaintiff was experiencing significant stomach pain, he felt nauseous and felt like he was going to throw up.  However, plaintiff realized he had just used two weeks of medical leave within the last month or so and, sensing the defendant was becoming irritated with him for his medical absences, plaintiff felt he needed to stay at work and try and fight through the flareup – however, his attempts were not successful.  At about 11:30 a.m. to Noon that day plaintiff knew he was going to throw up, so he went out to his car in the company parking lot and threw up a significant amount of bile into a plastic bag.  A Customer Service Manager for Sales, Lisa Benson ("Benson"), witnessed the event, asked plaintiff if he was OK, and told plaintiff he did not look well.

34.     That around this same time, between bouts of vomiting, Belcastro walked by plaintiff in the parking lot and asked plaintiff what was wrong.  Plaintiff replied that he was fine; that he didn't feel well, but that he could still work.  Belcastro replied by telling plaintiff he needed to go home.  Partially heeding Belcastro's advice, plaintiff drove straight from the parking lot at work to the MUSC emergency room.  While MUSC did not admit plaintiff, they gave him pain medication, told him not to eat anything solid, and sent plaintiff home.  All the while, plaintiff continued to throw up green bile.  Thereafter, plaintiff was sick with a pancreatic flareup for about four (4) days during which time he took medical leave from work.

35.     That before returning to work on or about September 28, 2021, plaintiff went to his doctor's office to pick up blood pressure medicine, all in an effort to keep his blood pressure under control, a circumstances directly related to plaintiff's pancreas divisum and a separate disability in its own right.  On this occasion, plaintiff picked up a different kind of blood pressure medication than what he had been taking to see if it would be more effective.  When plaintiff got to work at around 9:00 a.m. to 10:00 a.m. that day, he took the newly-prescribed blood pressure medicine.  The new medicine, however, made plaintiff's blood pressure so low that plaintiff became dizzy and almost passed out at work.  At some point that day Belcastro observed plaintiff in his weakened state.

36.     That later that same day (on or about September 28, 2021) matters came to a head when Belcastro entered plaintiff's office and shut the door behind him.  Initially, Belcastro questioned plaintiff about what his doctors had told him about his illnesses and how it would affect his work schedule.  Belcastro then stated in an irritated, impatient, and aggressive voice (without prior warning, notice or cause) that "We can't do this.  I have to have someone in the [Service Manager's] position that is dependable and that will be here."  Continuing in the same impatient and antagonistic tone, Belcastro told plaintiff that plaintiff had two (2) choices: quit working at defendant or step down to an Advisor position – a position which paid significantly less that what plaintiff was making and a position that held far-less authority and prestige.  Belcastro further made it clear that, if plaintiff did not accept the demotion and/or if he did not resign, that defendant would fire him in short order. Plaintiff responded by reminding Belcastro that he (Belcastro) knew about all of plaintiff's medical conditions and that plaintiff was doing the best he could.

37.    That plaintiff further advised Belcastro that there was no way he could make such an important decision about his job on such short notice, right there on the spot, and plaintiff also reminded Belcastro that, despite the false allegation that his absences were excessive, he still had three (3) vacation days left and that he wanted to use those vacation days to make a decision.  When plaintiff concluded his remarks by telling Belcastro that his ultimatum was not right or fair, surprisingly Belcastro rudely said "I don't care."  At no time during this conversation did Belcastro state, mention or say anything to plaintiff about job performance issues.  The only reason Belcastro gave to plaintiff for his demotion was plaintiff's disability-related and approved absences.  As to attendance, plaintiff did, in fact, still have three (3) days of leave left at the time of his demotion, his absences were directly related to his disabilities, plaintiff always advised the defendant of his illness and always received permission from the defendant to miss work when needed.

38.    That up to this point, defendant had not disciplined plaintiff in any shape or form for attendance (or for any other reason), despite the fact defendant has and follows a progressive discipline policy.  Moreover, at this point no one at defendant told plaintiff about his rights under the FMLA or ADA or provided plaintiff with any FMLA or ADA paperwork.  And as of this date, defendant had not entered into dialogue with the plaintiff about his impairments and possible accommodations under the ADA/ADAAA.  Nevertheless, Belcastro remained firm in regard to the ultimatum he gave to plaintiff. Sensing Belcastro's resolve, plaintiff requested and was granted leave from work for the remaining three (3) vacation days he had left so that he could have time to consider his options.

39.    That as such, plaintiff took September 28, 29 and 30, 2021 off as vacation days to try and decide what to do.  Given the salary and prestige of plaintiff's Service Manager

11

position, none of the choices made sense. The prospect of resignation or termination made no sense for obvious reasons. The prospect of demotion made no sense either because it was a commission only, non-supervisory position where plaintiff would earn significantly less income than he had been earning in his supervisory position. And, because plaintiff was promoted so quickly, he never really performed the Service Advisor job for any significant period of time and, thus, lacked experience. Finally, plaintiff would now be supervised by a less experienced and significantly younger employee that plaintiff had trained and plaintiff would now have to work under and with the other Advisors that plaintiff had previously supervised – a humiliating circumstance by all accounts.

        40.    That on or about Friday, October 1, 2021, plaintiff returned to work and, with no real choice in the matter, was demoted under protest, duress and objection down to an Advisor position. Belcastro then stuck plaintiff in a small, dingy office without overhead lighting (rendering the lighting insufficient in the office) and told plaintiff "This is where you will be." The office was also substantially smaller than plaintiff's prior office – about ½ to ¾ the size of plaintiff's Service Manager office. In fact, up until that day, the office had belonged to the younger Ranly. Knowing who the small office had previously belonged to, plaintiff asked Belcastro if he was going to promote Ranly, the young 24-year-old into his position. Belcastro looked plaintiff in the eyes, lied and said "No." But plaintiff soon observed that the significantly younger Ranly had indeed taken over his former Service Manager office and that Ranly was now working in it as the new Service Manager. To be sure, defendant did promote Ranly into plaintiff's position, even though plaintiff was significantly more experienced and possessed significantly more skills than the much younger and healthier Ranly.

41.     That moreover, after the demotion defendant treated plaintiff with less respect along the lines of what is described above and it isolated him from the other Advisors.  In this regard, all of the other eight (8) or nine (9) Advisors worked together at their desks in a hallway that was in close proximity to their customers, and which naturally gave them easy access to their customers.  Moreover, in working close to one another, the Advisors were able to converse and get to know one another, all of which helped them come together or to "gel" as a team.  Instead of placing plaintiff with the other Advisors at a desk in the hallway, defendant intentionally isolated plaintiff by placing him in Ranly's old office where he worked alone and where he was isolated from the other Advisors.  Also, there was a large glass wall between plaintiff and his small office and the hallway where the Advisors worked which served to further isolate plaintiff from his coworkers.

42.     That on or about October 15, 2021, plaintiff sent an email to Tashieka Mervin ("Mervin"), a Human Resource employee at defendant, and to his supervisor Belcastro reiterating the nature of his disabilities, seeking intermittent leave under the FMLA and ADA, reiterating his ability to perform the Service Manager's job, and complaining that he had been discriminated against under the ADA and ADEA in regard to his demotion (and discharge or constructive discharge) – thereby engaging in protected activity under the ADEA and ADA/ADAAA.

43.     That on or about October 18, 2021, a Human Resource employee responded to plaintiff's email attempting to explain to plaintiff some of his rights under the pertinent laws.

44.     That on or about October 21, 2021, Belcastro, the Director of Compliance, Gil Morris ("Morris"), and plaintiff met to discuss plaintiff's letter.  Surprisingly, Morris opened

the meeting by stating for the first time that plaintiff had been demoted for "poor performance," an alleged reason never conveyed to plaintiff at the time of his demotion.  Surprised by defendant's change in the reasoning for his demotion (and discharge or constructive discharge), plaintiff asked for specific examples of his alleged "poor performance."  In response, Morris and Belcastro provided plaintiff with the following three (3) alleged incidents of poor performance: (1) plaintiff had received an email from Nissan (while in the hospital) about a warranty hourly increase and plaintiff was unaware of it (or did not act upon it); (2) Belcastro had to meet with the plaintiff once a week, on Wednesdays; and (3) plaintiff could not keep a computer program known as the Dealer's Operation Program up to date.

45.    That plaintiff explained that none of the incidents provided were valid or true examples of poor performance.  As to the first issue, plaintiff clarified that Belcastro had been the one dealing with Nissan on the warranty issue.  Plaintiff had nothing to do with it – he was not involved in any emails or correspondence on the issue; he did not know why Nissan sent him the email; plaintiff was not expecting any such email; and he should not have received it. Additionally, plaintiff was in the hospital on FMLA/ADA protected leave when the email was sent to him and he was not aware he had received said email.

46.    That as to the second issue, plaintiff correctly asserted that the weekly meetings with his supervisor were not punitive, but rather a way for Belcastro and plaintiff to exchange information, without interruption.  Plaintiff further explained that Ranly also had to attend them and he was not disciplined – he was promoted.  Finally, plaintiff stated that he was never advised that his weekly meetings with his direct supervisor were disciplinary or punitive in nature.

47.     That finally as to the third item, plaintiff explained that he always kept the Dealer's Operation Program up to date.   Neither Morris nor Belcastro objected to any of plaintiff's remarks or took issue with them.   Not only are the above reasons false and not credible, but they are also trivial, non-serious offenses that would not warrant the severe type of discipline plaintiff received, or any discipline for that matter.

48.     That plaintiff then explained to Morris about how Belcastro had repeatedly praised his job performance and how Belcastro assured plaintiff of a promotion just a week or so before the demotion.   Plaintiff further advised Morris that Belcastro had repeatedly made such remarks to him throughout the time they worked together.   Morris had no reply other than a surprised look on his face.   For his part, Belcastro admitted that he made the statements, but explained that they were insincere and an attempt to motivate plaintiff – motivation plaintiff did not need.

49.     That on or about October 25, 2021, Morris sent plaintiff an email mischaracterizing the course of events to that point.   First, Morris stated that on September 27, 2021 Belcastro **transitioned** plaintiff for overall job performance.   Yet this was no transition.   It was a serious demotion and, in fact, a constructive discharge.   Belcastro never referred to a "transition" or to plaintiff's "poor performance" at the time he demoted plaintiff, but rather told plaintiff he was being demoted for missing work (for what Belcastro knew were absences related to plaintiff's disabilities). Morris then summarized plaintiff's October 15, 2021 letter complaining about discrimination, reassuring plaintiff that, in response to plaintiff's email, defendant undertook a thorough investigation into the allegations plaintiff raised (which is disputed) and it was found that plaintiff's demotion was related to the merger of the Service Director roles at Nissan of Charleston and Nissan of North Charleston, with Belcastro now

overseeing both positions, and that the other Service Manager and plaintiff were demoted for "poor performance." Finally, Morris advised plaintiff that the defendant found that plaintiff's claims of discrimination could not be substantiated.

50.    That thereafter, plaintiff still tried in good faith to make his new role as an Advisor work. But it was not to be. Based upon his experience, plaintiff knew going in to the new arrangement that he would be hard pressed to earn even one-half of what he had been earning as a Service Manager. However, after working extremely hard for three (3) months as an Advisor, plaintiff realized that his cut in pay was far more drastic than he anticipated. As a Service Manager, plaintiff earned around $144,000 a year in income (or what averaged out to be $12,000 a month) with full benefits, supervisory authority, and prestige. As a Service Advisor, plaintiff had no supervisory duties or authority, no real experience, worked in a dark, significantly smaller office than the one he had worked in as a Service Manager, he had been isolated from his coworkers, and he was only able to earn what averaged out to be about $2,600 a month during the three (3) months he worked as an Advisor at defendant from October through December of 2021 – a 79% decrease in pay.

51.    That plaintiff's demotion and the attendant cut in pay were so drastic that plaintiff could not support his family on it. With this drastic cut in pay and the other circumstances set forth above, defendant intentionally demoted plaintiff and made plaintiff's working conditions so intolerable that a reasonable person in plaintiff's position would have felt compelled to resign. And, defendant did so because of plaintiff's age, because plaintiff engaged in protected activity under the FMLA by requesting and taking FMLA leave, and/or because of plaintiff's disabilities, plaintiff's perceived disabilities, the absences related to plaintiff's disabilities, the fact that defendant erroneously believed plaintiff was too disabled to perform the

duties of his job, and because plaintiff engaged in protected activity under the ADA/ADAAA by requesting and using reasonable accommodations in the form of short-term intermittent medical leave.

**FOR A FIRST CAUSE OF ACTION:**
**VIOLATION OF THE ADEA**
**DISCRIMINATION BASED ON AGE**
**DEMOTION/CONSTRUCTIVE DISCHARGE**

52.    That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 51 hereinabove as fully as if set forth verbatim.

53.    That defendant is a "person" within the meaning of the ADEA, 29 U.S.C. § 630(a).

54.    That defendant is in an industry that affects commerce and defendant employed twenty (20) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar years and, thus, defendant is an employer as defined by the ADEA, 29 U.S.C. § 630(b).

55.    That plaintiff was born in 1963 and, thus, was in his late fifties and well over forty (40) years of age at the time of defendant's discriminatory conduct against him. Therefore, plaintiff was in a protected class.

56.    That at all times during plaintiff's employment at defendant, plaintiff performed his job duties at a level that met defendant's legitimate performance expectations, as plaintiff was never disciplined at defendant, he always met his goals and metrics, and management repeatedly complimented him on his job performance.

57.    That despite the above, defendant demoted plaintiff because of his age, all without warning, notice or cause, and for false reasons and/or reasons that were unworthy of

credence.  As such, plaintiff's wrongful demotion constitutes an adverse employment action under the ADEA.

58.   That after demoting plaintiff, defendant replaced plaintiff with someone outside of plaintiff's protected class, namely it replaced plaintiff with Ranly, a less-experienced and less-skilled 24-year-old male that plaintiff trained, and who was at least ***thirty (30) years*** younger than plaintiff.

59.   That based upon the below circumstances, among others, defendant demoted plaintiff because of his age:

a)   Defendant hired a much younger employee – an employee 30 years younger than plaintiff, into plaintiff's position;

b)   Plaintiff had actually trained his replacement and obviously was considerably more experienced, more qualified, and possessed a far stronger skill set for the job than his replacement.  To plaintiff's knowledge, his replacement did not have any prior supervisory experience;

c)   Defendant demoted plaintiff without prior warning, notice or cause and without any previous disciplinary action, or even coaching, for attendance, performance or conduct – all despite the fact that defendant had and utilized a progressive discipline policy;

d)   Defendant gave plaintiff two (2) different and inconsistent reasons for his demotion, first telling plaintiff he was demoted for attendance, with no mention of performance, and later telling plaintiff he was being demoted for performance issues, with no mention of attendance; and

e)   Both reasons are false and/or lack credibility.  Plaintiff did not have an attendance issue; he never exceeded the amount of leave time provided to him by defendant; he always timely called in when he had to miss work; his absences were all approved, and all related to plaintiff's health conditions which are covered by the FMLA and/or the ADA/ADAAA.  Conversely, plaintiff did not have any performance issues as evidenced by the positive verbal remarks and compliments of his supervisors that took place up until the time plaintiff was demoted; there was no discipline in plaintiff's file; and plaintiff's team consistently outperformed other similar teams at defendant's other dealerships.

18

60.   That as such, defendant demoted plaintiff because of plaintiff's age in violation of the ADEA.

61.   That after being demoted, plaintiff tried in good faith for over three (3) months to make his new Advisor job work.   However, defendant made plaintiff's working conditions so intolerable because of plaintiff's age that any reasonable person in plaintiff's position would have felt compelled to resign by, among other things, engaging in the below conduct against plaintiff:

a) After the demotion, defendant stuck plaintiff in a dingy office, significantly smaller than plaintiff's prior office, it was without an overhead light, and, in general, lacked sufficient lighting.  In placing plaintiff in the said office, defendant advised plaintiff in an aggressive voice, "This is where you will be."  In fact, it was Ranly's old office;

b) Defendant lied to plaintiff, telling plaintiff that Ranly was ***not*** going to replace him when, in fact, defendant had already put Ranly into plaintiff's prior position (and office);

c) After the demotion, defendant's management began to treat plaintiff in a disrespectful manner;

d) That as a result of the demotion, plaintiff's pay was cut drastically – to the point he could no longer support his family as, prior to plaintiff's demotion, plaintiff earned $144,000 a year at defendant, with full benefits (or what amounted to $12,000 a month) and after his demotion, plaintiff earned on average a little over $2,600 a month, which constitutes a 79% pay cut;

e) Defendant demoted plaintiff from a prestigious management position with authority over other employees and a significant salary to a lower-level position where he would be supervised and forced to work with the very employees he had supervised for years, all in front of his peers, while management was fully aware plaintiff could not succeed or survive in his lower-paying job – a circumstance which caused plaintiff significant anxiety, distress, embarrassment and humiliation; and

f) Defendant isolated plaintiff from his fellow Advisors by not allowing plaintiff to work at a desk in the hallway with the other eight (8) or

nine (9) Advisors but, rather, stuck plaintiff in a small, dimly lit and dingy office that was separated from the other Advisors and which had a glass wall that served to further isolate plaintiff from his coworkers.

62.    That on or about January 6, 2022, plaintiff was forced to leave employment with defendant, all as a direct result of the intolerable working conditions defendant imposed upon him because of plaintiff's age and, as a result, defendant constructively fired plaintiff, all in violation of the ADEA.

63.    That as a direct result of the actions of the defendant, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, economic injury, and plaintiff further seeks damages from the defendant in the form of reasonable attorney's fees and costs and prejudgment interest, all as authorized by the ADEA.

64.    That defendant's actions as described above were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover liquidated damages from the defendant.

**FOR A SECOND CAUSE OF ACTION:**
**VIOLATION OF THE FMLA**
**RETALIATION/INTERFERENCE**

65.    That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 64 hereinabove as fully as if set forth verbatim.

66.    That pursuant to the FMLA, plaintiff had been employed with defendant for over 12 months, had provided over 1,250 hours of service to defendant during the 12 months prior to his leave, and was otherwise employed at a work site where 50 or more employees are employed by defendant within 75 miles of the work site.

67.    That defendant is engaged in commerce and/or an industry or activity affecting commerce and employed 50 or more employees each working day during each of the 20 or more work weeks in the current or preceding calendar year.

68.    That as such, plaintiff is a covered employee and defendant is a covered employer under the FMLA.

69.    That plaintiff was suffering from at least three (3) serious health conditions during the time he was employed at defendant:  Pancreas Divisum,  Type II Insulin Dependent Diabetes, and COVID.  Plaintiff's Pancreas Divisum and Type II Insulin Dependent Diabetes are chronic, long-term, and likely permanent impairments that plaintiff will battle for the rest of his life.    All three conditions required inpatient treatment, overnight hospitalization, and/or continuing treatment by plaintiff's healthcare providers.  Thus, plaintiff was suffering from a serious health condition as defined by the FMLA.

70.    That plaintiff engaged in protected activity under the FMLA on or about August 9, 2021, on or about August 10, 2021 through August 24, 2021, on or about September 24, 2021, and on or about September 24, 2021 through September 28, 2021, by requesting and taking FMLA leave (or leave that should have been covered by the FMLA and/or that should have been designated as such by the defendant).

71.    That on or about September 28, 2021, defendant demoted plaintiff on the very day plaintiff returned to work from FMLA leave and on the very day plaintiff's direct supervisor saw plaintiff sick at work.  Moreover, defendant demoted plaintiff just four (4) days after plaintiff requested and took FMLA leave (or leave that should have been covered by the Act) and within four (4) days of plaintiff's direct supervisor observing plaintiff extremely sick in the company parking lot.  As such, a causal connection exists between plaintiff's protected

activities and his demotion as evidenced by the short period of time between the two (2) events and the other evidence enumerated below.

72.    That moreover, when the defendant demoted plaintiff it told him he was being demoted for his FMLA-related absences (or what should have been FMLA absences and/or for absences that defendant should have designated as FMLA leave); defendant gave plaintiff two (2) different, inconsistent reasons for the demotion; both reasons were false and/or unworthy of credence; and defendant hired an employee into plaintiff's position who was at least thirty (30) years younger than plaintiff, he was healthier than plaintiff, and he did not have a history or record of requesting or taking FMLA leave.

73.    That based upon the above, defendant has violated the FMLA by not returning plaintiff to his same job or to a substantially similar position when plaintiff returned to work from FMLA leave and it demoted plaintiff in retaliation for engaging in protected activities under the Act, namely for requesting and taking FMLA leave and/or for absences covered by the FMLA (or that should have been covered by the said Act or that should have been designated by the defendant as FMLA leave).

74.    That after his demotion, plaintiff continued to work at the defendant and tried in good faith for over three (3) months to make his circumstances as an Advisor work. Plaintiff worked at his Advisor job as hard as he worked at his Service Manager job.

75.    That despite plaintiff's best efforts in his new position, defendant made plaintiff's working conditions so intolerable that a reasonable person in plaintiff's position would have felt compelled to resign.  Defendant created the said intolerable working conditions all because plaintiff exercised his rights under the FMLA as described above, and these conditions included, but are not limited to the following:

a) After the demotion, defendant stuck plaintiff in a dingy office, significantly smaller than plaintiff's prior office, it was without an overhead light, and, in general, lacked sufficient lighting. In placing plaintiff in the said office, defendant advised plaintiff in an aggressive voice, "This is where you will be." In fact, it was Ranly's old office;

b) Defendant lied to plaintiff, telling plaintiff that Ranly was **not** going to replace him when, in fact, defendant had already put Ranly into plaintiff's prior position (and office);

c) After the demotion, defendant's management began to treat plaintiff in a disrespectful manner;

d) That as a result of the demotion, plaintiff's pay was cut drastically – to the point he could no longer support his family as, prior to plaintiff's demotion, plaintiff earned $144,000 a year at defendant, with full benefits (or what amounted to $12,000 a month) and after his demotion, plaintiff earned on average a little over $2,600 a month, which amounts to a 79% pay cut;

e) Defendant demoted plaintiff from a prestigious management position with authority over other employees and a significant salary level to a lower-level, non-supervisory position where he would be supervised and forced to work under and with the very employees he had supervised for years, all in front of plaintiff's peers, and all while management was fully aware plaintiff could not succeed or survive in his lower-paying job – a circumstance which caused plaintiff significant anxiety, distress, embarrassment and humiliation; and

f) Defendant isolated plaintiff from his fellow Advisors by not allowing plaintiff to work at a desk in the hallway with the other eight (8) or nine (9) Advisors but, rather, stuck plaintiff in a small, dingy office that was separated from the other Advisors and which had a glass wall that served to further isolate plaintiff from his coworkers.

76.    That as a direct result of the intolerable working conditions set forth above (and others) plaintiff was ultimately forced to leave the defendant and, as such, defendant constructively fired plaintiff, thereby again violating the FMLA.

77.    That as a result of the actions of the defendant as set forth above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, medical bills, expenses associated with finding other work, economic injury, and plaintiff further seeks

damages from defendant in the form of reasonable attorney's fees and costs and prejudgment interest.

78.     That defendant's actions as described above were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover liquidated damages from the defendant.

**FOR A THIRD CAUSE OF ACTION:**
**VIOLATION OF THE ADA/ADAAA**
**TERMINATION BASED UPON DISABILITY**
**AND/OR PERCEIVED DISABILITY**

79.     That plaintiff hereby repeats and realleges each and every allegation in Paragraphs 1 through 78 hereinabove as fully as if set forth verbatim.

80.     That as alleged above, at all pertinent times as defined by the ADA/ADAAA, defendant employed fifteen (15) or more employees and, thus, is an "employer" as defined by said Act and otherwise subject to it.

81.     That as a result of plaintiff's pancreas divisum and his Type II Insulin Dependent Diabetes, and the combined effect of the two impairments, plaintiff was substantially limited in one or more major life activity, namely eating, digesting, sleeping, thinking, focusing, climbing and working, among other things.  Moreover, the two (2) impairments identified above are chronic, long-term and likely lifetime impairments, with the pancreas divisum actually being a birth defect that has been with plaintiff since birth.

82.     That despite the above, plaintiff could perform the essential duties of his job at defendant with reasonable accommodations in the form of intermittent medical leave of a short duration, generally for about a week, whenever his flareups occurred and also in the form of liberal work breaks in the event the flareup was not a serious one and plaintiff could overcome it without missing work.

83.    That as such, the plaintiff is disabled as defined by the ADA/ADAAA. Moreover, the defendant regarded or perceived plaintiff as being disabled as defined by that Act, and it erroneously believed plaintiff's disabilities, or perceived disabilities, prevented him from performing the essential duties of his Service Manager position at defendant.

84.    That as alleged, plaintiff performed his job duties at defendant at a level that met defendant's legitimate expectations as, even though defendant never provided plaintiff with a formal written performance evaluation, plaintiff's supervisors routinely told plaintiff that he did a good job and they complimented plaintiff on the level of his performance, literally up until about the day plaintiff was demoted. Plaintiff's final supervisor, Belcastro, even assured plaintiff that, when he (Belcastro) left his position at defendant, that plaintiff would be placed in it, becoming the new Fixed Operations Director; and plaintiff was never disciplined, placed on a performance improvement plan, or admonished regarding his job performance, his conduct, or attendance during the entire length of his employment at defendant – even though defendant had, and used, a progressive discipline policy. Finally, as to performance, plaintiff and his team always ranked number one (1) out of approximately nine (9) Hudson Nissan dealerships on the east coast and it consistently ranked first or second place compared to all Hudson dealerships in terms of meeting the defendant's metrics.

85.    That despite the above, defendant demoted plaintiff without prior warning, notice, discipline or cause (even though the defendant has and utilizes a progressive discipline policy) and for false reasons and/or reasons unworthy of credence.

86.    That in reality, defendant demoted plaintiff because plaintiff is disabled and/or because defendant perceived or regarded plaintiff as disabled and/or because of absences associated with plaintiff's disabilities. In addition, defendant erroneously believed plaintiff's

disabilities and/or perceived disabilities rendered him unable to perform the Service Manager job.

87.    That to this point, defendant demoted plaintiff the very day plaintiff returned to work from disability-related absences and/or ADA accommodation leave and the very day plaintiff's direct supervisor observed plaintiff sick at work.  It further demoted plaintiff within about four (4) days after plaintiff requested and took ADA/ADAAA related leave and/or ADA accommodation leave; and within about four (4) days after plaintiff's supervisor saw plaintiff extremely ill at work in the company parking lot.  Moreover, defendant advised plaintiff that plaintiff was being demoted for disability-related absences or for taking ADA accommodation leave; defendant gave plaintiff two (2) different, inconsistent reasons for his demotion; both reasons were false and/or unworthy of credence; and defendant replaced plaintiff with a less-qualified employee more than thirty (30) years younger than plaintiff, who was not suffering from any known disabilities.

88.    That as such, defendant violated the ADA/ADAAA by demoting plaintiff because of his disabilities and/or because of his perceived disabilities and/or because of the absences related to plaintiff's disabilities and/or because it erroneously believed plaintiff's disabilities and/or perceived disabilities prevented him from performing the essential duties of his Service Manager job.

89.    That after his demotion, plaintiff continued to work at the defendant in his lower-level job, and attempted in good faith to successfully perform the duties of said job.

90.    That despite the above, after defendant knowingly demoted plaintiff into a position it knew plaintiff could not succeed at, defendant then made plaintiff's working conditions so intolerable that any reasonable person in plaintiff's position would have felt

compelled to resign.  Defendant created the said intolerable working conditions all because of plaintiff's disabilities, perceived disabilities, and/or disability-related absences and these intolerable conditions included, but were not limited to, the following:

a) After the demotion, defendant stuck plaintiff in a dingy office, significantly smaller than plaintiff's prior office, it was without an overhead light, and, in general, lacked sufficient lighting.  In placing plaintiff in the said office, defendant advised plaintiff in an aggressive voice, "This is where you will be."  In fact, it was Ranly's old office;

b) Defendant lied to plaintiff, telling plaintiff that Ranly was ***not*** going to replace him when, in fact, defendant had already put Ranly into plaintiff's prior position (and office);

c) After the demotion, defendant's management began to treat plaintiff in a disrespectful manner;

d) That as a result of the demotion, plaintiff's pay was cut drastically – to the point he could no longer support his family as, prior to plaintiff's demotion, plaintiff earned $144,000 a year at defendant, with full benefits (or what amounted to $12,000 a month) and after his demotion, plaintiff earned on average a little over $2,600 a month – a 79% pay cut;

e) Defendant demoted plaintiff from a prestigious management-level position with authority over other employees and a significant salary to a lower-level, non-supervisory position where plaintiff would be supervised and forced to work under and with the very employees he had supervised for years, all in front of plaintiff's peers, while management was fully aware plaintiff could not succeed or survive in his lower-paying job – circumstances which caused plaintiff significant anxiety, distress, embarrassment and humiliation; and

f) Defendant isolated plaintiff from his fellow Advisors by not allowing plaintiff to work at a desk in the hallway with the other eight (8) or nine (9) Advisors but, rather, stuck plaintiff in a small, dingy and dimly lit office that was separated from the other Advisors and which had a glass wall that served to further isolate plaintiff from his coworkers.

91.   That as a direct result of the intolerable working conditions set forth above (and others) plaintiff was ultimately forced to leave the defendant and, as such, defendant constructively fired plaintiff, and thereby again violated the ADA/ADAAA.

92.   That as a result of defendant's actions as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, pain and suffering, loss of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment, humiliation, loss of professional standing, character and reputation, physical and personal injuries and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

93.   That defendant's actions as described above were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover punitive damages from the defendant.

**FOR A FOURTH CAUSE OF ACTION:**
**VIOLATION OF THE ADA/ADAAA**
**RETALIATION**

94.   That plaintiff hereby repeats and realleges each and every allegation in Paragraphs 1 through 93 hereinabove as fully as if set forth verbatim.

95.   That as alleged above, at all pertinent times as defined by the ADA/ADAAA, defendant employed fifteen (15) or more employees and, thus, is an "employer" as defined by said Act and is otherwise subject to it.

96.   That plaintiff engaged in protected activity under the ADA/ADAAA on or about August 9, 2021, on or about August 10, 2021 to August 24, 2021, on or about September 24, 2021, and on or about September 24, 2021 to September 28, 2021, by requesting and using a

reasonable accommodations under the ADA/ADAAA in the form of intermittent, short-term medical leave.

97.    That defendant demoted plaintiff on or about September 28, 2021, the very day plaintiff returned to work from ADA accommodation leave (or from disability-related absences) and the very day plaintiff's direct supervisor saw plaintiff sick at work.  Moreover, defendant demoted plaintiff just four (4) days after plaintiff last requested and took ADA accommodation leave (or disability-related leave) and four (4) days after plaintiff's direct supervisor observed plaintiff extremely ill in the company parking lot.

98.    That as such, a causal connection exists between plaintiff's protected activity and his demotion by virtue of the timing evidence set forth above.  Moreover, defendant told plaintiff when it demoted him that he was being demoted for absences directly caused by and related to his disabilities (or for using ADA accommodation leave); defendant demoted plaintiff without warning, notice or discipline, despite the fact that defendant has and uses a progressive discipline policy; defendant gave plaintiff two (2) different, inconsistent reasons for his demotion; both reasons given to plaintiff were false and/or unworthy of credence; and defendant replaced plaintiff with a younger, healthier employee who had not previously engaged in protected activity.

99.    That as such, defendant violated the ADA by demoting plaintiff because plaintiff engaged in protected activity under the ADA/ADAAA (in the form of requests for reasonable accommodations and in the form of actually using the accommodations) and, as such, defendant unlawfully retaliated against plaintiff, all as prohibited by the Retaliation provision contained in the said Act (42 U.S.C. § 12203).

100.  That after his demotion, plaintiff continued to work at the defendant in his lower-level job, and attempted in good faith to successfully perform the duties of said job.

101.  That despite the above, defendant knowingly demoted plaintiff into a position it knew plaintiff could not succeed at, and defendant made plaintiff's working conditions so intolerable (because he engaged in protected activity under the ADA/ADAAA) that any reasonable person in plaintiff's position would have felt compelled to resign by, among other things, engaging in the below conduct against the plaintiff:

    a) After the demotion, defendant stuck plaintiff in a dingy office, significantly smaller than plaintiff's prior office, it was without an overhead light, and, in general, lacked sufficient lighting. In placing plaintiff in the said office, defendant advised plaintiff in an aggressive voice, "This is where you will be." In fact, it was Ranly's old office;

    b) Defendant lied to plaintiff, telling plaintiff that Ranly was ***not*** going to replace him when, in fact, defendant had already put Ranly into plaintiff's prior position (and office);

    c) After the demotion, defendant's management began to treat plaintiff in a disrespectful manner;

    d) That as a result of the demotion, plaintiff's pay was cut drastically – to the point he could no longer support his family as, prior to plaintiff's demotion, plaintiff earned $144,000 a year at defendant, with full benefits (or what amounted to $12,000 a month) and after his demotion, plaintiff earned on average $2,600 a month – a 79% pay cut;

    e) Defendant demoted plaintiff from a prestigious management-level position with authority over other employees and a significant salary to a lower-level, non-supervisory position where he would be supervised by and forced to work with the very employees he had supervised for years, all in front of his peers, while management was fully aware plaintiff could not succeed or survive in his lower-paying job – a circumstance that caused plaintiff significant anxiety, distress, embarrassment and humiliation; and

    f) Defendant isolated plaintiff from his fellow Advisors by not allowing plaintiff to work at a desk in the hallway with the other eight (8) or nine (9) Advisors but, rather, stuck plaintiff in a small, dingy office

that was separated from the other Advisors and which had a glass wall
that served to further isolate plaintiff from his coworkers.

102.   That as a direct result of the intolerable working conditions set forth above
(and others) plaintiff was ultimately forced to leave the defendant and, as such, defendant
constructively fired plaintiff, thereby again violating the ADA/ADAAA.

103.   That as a result of defendant's actions as set forth above, plaintiff has been
damaged in the form of lost back and future wages, income and benefits, expenses associated
with finding other work, severe psychological harm, emotional distress, pain and suffering, loss
of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment,
humiliation, loss of professional standing, character and reputation, physical and personal
injuries and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment
interest.

104.   That defendant's actions as described above were undertaken intentionally,
willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected
rights and, therefore, plaintiff is entitled to recover punitive damages from the defendant.

**FOR A FIFTH CAUSE OF ACTION:**
**VIOLATION OF THE ADA/ADAAA**
**FAILURE TO ENGAGE IN DIALOGUE/**
**INTERACTIVE PROCESS**

105.   That plaintiff hereby repeats and realleges each and every allegation in
Paragraphs 1 through 104 hereinabove as fully as if set forth verbatim.

106.   That as alleged above, at all pertinent times as defined by the
ADA/ADAAA, defendant employed fifteen (15) or more employees and, thus, is an "employer"
as defined by said Act and is otherwise subject to it.

107.   That as alleged above, plaintiff is disabled as defined by the ADA/ADAAA and/or defendant perceived him as such.

108.   That on many occasions plaintiff conveyed specific facts about his impairments or disabilities to his immediate supervisor and other management and Human Resource level employees at the defendant, including, but not limited to, the name or identity of his impairments, the symptoms of it, and his prognosis.  Moreover, plaintiff's direct supervisor observed plaintiff having symptoms from his disabilities at work on more than a few occasions.

109.   That in addition to the above, plaintiff repeatedly requested reasonable accommodations from defendant in the form of intermittent medical leave of a limited duration – typically between three (3) to five (5) days.  Moreover, plaintiff would use the accommodation and take medical leave.

110.   That yet on those occasions when plaintiff imparted medical information to the defendant or when he requested a reasonable accommodation from the defendant, no one at the defendant engaged in dialogue or in any other interactive process with plaintiff, all as required by the ADA/ADAAA, to determine the nature and extent of plaintiff's disabilities and potential accommodations for said disabilities – accommodations that would have allowed plaintiff to take sick leave and still perform the essential functions of his job.

111.   That had defendant engaged in the interactive process with plaintiff as required by the ADA/ADAAA, it would have never demoted plaintiff in the first place or constructively discharged him.

112.   That instead, when plaintiff provided defendant with medical information concerning his disabilities, or whenever he requested a reasonable accommodation (which defendant would grudgingly grant to plaintiff) defendant would ***not*** engage in dialogue with the

plaintiff but, instead, it became irritated and resentful towards plaintiff for having said disabilities and/or for missing work because of them.

113.    That defendant violated the ADA/ADAAA by refusing to enter into dialogue with the plaintiff and/or by refusing to involve him in any type of interactive process to determine the nature and extent of his disabilities and potential reasonable accommodations, all of which resulted in plaintiff's demotion and constructive discharge from defendant.

114.    That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

115.    That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

WHEREFORE, plaintiff prays for judgment against the defendant as follows:

(a)    As to plaintiff's First Cause of Action (under the ADEA) and plaintiff's Second Cause of Action (under the FMLA), plaintiff prays for such an amount of actual and special damages as the trier of fact may find (including lost back and future wages, income and benefits, medical bills, expenses associated with finding other work, and other economic injuries), liquidated damages, prejudgment interest, the costs and disbursements of this action,

including plaintiff's reasonable attorney's fees, and for such other and further relief as the court deems reasonable, just and proper and

(b)     As to plaintiff's Third, Fourth and Fifth Causes of Action (under the ADA/ADAAA), plaintiff prays for the following relief against defendant: for such amount of actual and special damages as the trier of fact may find, (including lost back and future wages, income and benefits, expenses associated with finding other work, medical bills, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), punitive damages, the costs and disbursements of this action, including his reasonable attorney's fees, prejudgment interest and for such other and further relief as the court deems just and proper.

HITCHCOCK & POTTS

By:  *s/A. Christopher Potts*
Federal ID No.:  5517
222 West Coleman Blvd., Suite 124 #11
Mt. Pleasant, SC 29464
Telephone:  (843) 577-5000
Email:  cpotts@hitchcock-potts.com
***Attorneys for the Plaintiff***

Charleston, South Carolina
August 9, 2023